IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

CORTEZ D. WILLIAMS
    Petitioner,

v.                                                 1:24-cv-1089-JEH

JOHN BARWICK, Warden,
    Respondent.[1]

## Order and Opinion

Before the Court is Petitioner Cortez D. Williams' Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (Doc. 1). Petitioner is currently serving a 60-year imprisonment sentence imposed by the Peoria County Circuit Court in Peoria, Illinois, after a jury found him guilty of first degree murder. Petitioner raises multiple challenges to his conviction. For the reasons below, the Court DENIES the Petition and DECLINES to issue a certificate of appealability.

### I[2]

### A

On September 24, 2013, Petitioner was charged with the first degree murder of Melvin Sanders. After counsel was appointed for Petitioner, he was scheduled

---

[1] Respondent reports that John Barwick is now the warden at Pinckneyville Correctional Center, where Petitioner remains incarcerated. (Doc. 11 at 1). Accordingly, the Court substitutes John Barwick as respondent. *See* Fed. R. Civ. P. 25(d).

[2] The facts are taken from the undisputed facts in Respondent's Response (Doc. 11), which are consistent with the official records from Petitioner's state court proceedings, which Respondent attached to the response (Doc. 12; *People v. Williams,* 2016 IL App (3d) 149380-U; *People v. Williams,* 2023 IL App (3d) 190317-U). *See* 28 U.S.C. § 2248 ("The allegations of a return to the writ of habeas corpus or of an answer to an order to

for a jury trial on February 3, 2014. A later defense motion for a continuance was granted, moving the trial to March 10, 2014. The parties confirmed in the pre-trial conferences leading up to the trial that they were ready to proceed to trial. *People v. Williams*, 2023 IL App (3d) 190317-U, ¶ 4.

However, on March 10, 2014, "approximately 30 minutes prior to the start of trial, [Petitioner] moved to continue to retain private counsel." *Id*. ¶ 5. Defense counsel reported that he had learned that morning that the day before Petitioner's family had told Petitioner they had gathered funds to retain private counsel. Petitioner stated that no counsel had been hired yet. After the court noted that Petitioner had been arrested September 23, 2013 and it was now March 10, 2014, and then asked Petitioner "And you spoke to your family about hiring a lawyer this weekend?" (Doc. 12-3 at 24). Petitioner responded, "Yes. They did not have the money accumulated for a lawyer, Your Honor. They just now have pulled some loans out and were able to do it over the weekend." *Id*.

The trial court expressed its frustration and need for clarity considering an hour prior everyone indicated they were ready for trial. *Williams*, 2023 IL App (3d) 190317-U, ¶ 6. The trial court stated, in part:

> If you had come in here and had your attorney that you had paid and made your arrangements or whatever the arrangements were, and he or she came in here and entered their appearance, it would be a different story.
>
> But all we are now is like some sort of random telephone call that: Whoop, stop. Stop the train. We might have some money and we might have a lawyer, but we don't know who it is or whether they would take the case or whether I would like them or whether he or she would like you and get to the case. And then we're back in the ditch

show cause in a habeas corpus proceeding, if not traversed, shall be accepted as true except to the extent that the judge finds from the evidence that they are not true."). The factual determinations of the state court are presumed to be correct, unless a petitioner rebuts the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

again starting from the very beginning. That seems disingenuous to
me.

*Id.* The trial court asked counsel to gather more information to determine why the
request was brought at the last minute after the parties had already confirmed that
they were prepared to proceed to trial.

When they came back, counsel reported he had spoken to Petitioner's
mother, who stated that the family was still working to secure funds and believed
they could retain counsel within two weeks, but did not indicate that she had
spoken with any attorney about the case. The court denied the motion, finding that
"the request was not realistic." *Id.* ¶ 7.

Prior to trial, the State had also filed a motion in limine to exclude any
testimony that the victim had a concealed handgun at the time of the shooting, as
well as testimony of the victim's prior criminal record and his tattoos. *People v.
Williams*, 2016 IL App (3d) 140380-U, ¶ 4. The trial court granted the motion, but
stated that the ruling could be revisited during trial if it became "evident and clear
that the defendant himself knew of those things and acted or reacted because of
it." *Id.* ¶ 5.

**B**

The case proceeded to trial, where the evidence showed that Petitioner first
encountered Sanders on September 13, 2013. Sanashai Dillard testified that
Petitioner approached her and four of her female friends inside a liquor store on
September 13, 2013. *Williams*, 2016 IL App (3d) 140380-U, ¶ 6. The women walked
to Dillard's "aunty's" house on Stanley Street as the Petitioner followed in a red or
maroon car. *Id.*

Petitioner talked to the women outside, then left and returned
approximately 30 minutes later. *Id.* ¶ 7; Doc. 12-3 at 257. When he returned,

3

Petitioner began acting rude by announcing he was "obsolete," which Dillard interpreted as meaning that no one could touch him. *Williams*, 2016 IL App (3d) 140380-U, ¶ 7. Petitioner also insinuated that he had a gun and stated he was able to carry it on him without anyone seeing the gun. *Id*. Sanders was talking to another woman nearby, heard Petitioner, (Doc. 12-3 at 260–61), came over, and asked Petitioner if he had a problem, *Williams*, 2016 IL App (3d) 140380-U, ¶ 7. Petitioner told Sanders to mind his own business. *Id.* Sanders then asked Dillard if she knew Petitioner, and she told him that she did not. *Id.* ¶ 8. Dillard testified that Sanders tried to punch Petitioner, but he missed. *Id.* Petitioner then pulled out a handgun and pointed it at Sanders. Petitioner walked backward and said, "[w]hat you want fam?" *Id.* Dillard's friend (KeiAmber Beard) and her cousin broke up the confrontation and Petitioner drove away in his car. *Id*.

Eight days later, on September 21, 2013, Dillard testified that there was another family gathering nearby. (Doc. 12-3 at 266). This gathering was also on Stanley street, but a few houses down. Keenan Hardy testified that a man walked up behind him at the gathering and then he heard gunshots and realized he had been shot in the back of the head. *Williams*, 2016 IL App (3d) 140380-U. ¶ 9. Arnita Smith, Sanders' aunt, testified that she was at the family gathering and felt something brush past her nose and heard gunshots. *Id*. ¶ 10. When the gunshots stopped, she saw Sanders lying on the ground. *Id.*

Antonio Hardy was also present at the gathering and testified that he was playing music in his truck for the gathering when he saw a man standing over a body and shooting the body twice. *Id.* ¶ 11. Hardy drove his truck towards the shooter and the shooter aimed his weapon at Hardy's truck, but did not fire. *Id.* The shooter ran away on foot and Hardy chased the shooter and ran the shooter over with his vehicle. *Id.* Hardy watched the shooter enter a grey Monte Carlo and Hardy followed the Monte Carlo for several miles before the police intervened. At

4

trial, Hardy testified that during the chase, a passenger of the car jumped out of the silver Monte Carlo and into a red-colored car. (Doc. 12-3 at 318). Hardy continued chasing the Monte Carlo until police stopped both vehicles. *Williams,* 2016 IL App (3d) 140380-U, ¶ 11.

Police officers testified that they arrested Petitioner as he got out of the Monte Carlo. *Id.* ¶ 12. The police later searched the Monte Carlo and found a semiautomatic handgun under the driver's seat. Petitioner's leg was injured, and he told officers at the scene that he had hurt it playing basketball. *Id.* Petitioner was eventually taken to the hospital for treatment of his leg.

After he was discharged, detectives interviewed Petitioner at the police station. *Id.* ¶ 15. The videotape of the interview was played for the jury. (Doc. 12-3 at 332–33). Petitioner first told the detectives that he hurt his leg playing basketball, then he said a white SUV hit him while he was talking to a woman, then later he admitted that he injured his leg near the scene of the shooting. *Williams,* 2016 IL App (3d) 140380-U, ¶ 16. Petitioner claimed he was walking past the gathering when he heard Sanders say "what's up." *Id.* Petitioner then pulled out his gun and shot Sanders several times. *Id.* Petitioner told detectives that "[he] wasn't out to get nobody but the dude that was f* * * with [him]." *Id.* Petitioner explained he used .40 caliber rounds in the shooting and believed the two 9mm caliber shell casings could be attributed to someone firing at him as he ran away. *Id.*

The state presented evidence that Sanders died from nine gunshot wounds. Four .40 caliber shells were covered from the scene and matched the gun found in Petitioner's Monte Carlo. Two 9mm shell casings recovered from the scene were fired from a different gun.

After the state rested, Petitioner took the stand in his own defense. *Id.* ¶ 17. Petitioner's account of his initial meeting with Sanders on September 13, 2013, and

5

the shooting on September 21, 2013, largely tracked the testimony of the state's witnesses, but with a few key differences and additional details. Petitioner testified that on September 13, 2013, he saw seven or eight women at a liquor store and spoke with the women a few minutes later at a nearby home on Stanley Street. *Id.* After speaking with the women for 15 or 20 minutes, Petitioner left and went home to change his clothes and take a shower. He returned to Stanley Street about 45 minutes to an hour later, and was armed with a gun for his own protection. *Id.* Petitioner again spoke with the group of women. *Id.* One of the women asked him why you talking shit for," and then Petitioner heard a male say "whoever here talking shit?" *Id.* Petitioner did not know this person, but later learned he was Sanders. Sanders asked one of the women if they knew Petitioner. When she responded "no," Sanders punched Petitioner in the left jaw.

Petitioner said that once he was punched in the face, Sanders and another unidentified male approached him. *Id.* ¶ 18. Petitioner was afraid he was going to be jumped by the men, so he pulled out his gun and held it down at his side. *Id.* When Sanders saw the gun, he moved his jacket out of the way and said "oh, we got those too." *Id.* Petitioner thought he saw the butt of a gun because something black was sticking up on Sanders' hip. *Id.* Then, Petitioner said everyone scattered and Petitioner walked back to his car and returned home. *Id.* Petitioner said he felt scared during this encounter because Sanders was bigger than him. *Id.*

Petitioner returned to the area on September 21, 2013, driving his girlfriend's Monte Carlo. Again, he testified he was armed with a gun for self-protection. *Id.* ¶ 19. Petitioner parked the Monte Carlo and hopped out to talk to and walk with a woman. *Id.* The woman left, and Petitioner chose to walk back down Stanley Street to get back to the Monte Carlo. *Id.* Petitioner saw a group of people outside of a home on Stanley Street and hesitated before he decided it was safe to walk by the house. *Id.* As he walked by the house, he heard a familiar voice

6

(Sanders' voice) say "what's up." *Id*. Petitioner looked and saw Sanders bent at the shoulders holding a bottle with one hand and his other hand was in his jacket pocket. *Id*. Petitioner said he saw Sanders make a "pulling out motion" as though Sanders' hand was coming out of his jacket pocket. *Id*. Petitioner testified that he thought Sanders was going for a gun "because [Petitioner] pulled a gun out on [Sanders], so [Petitioner] thought [Sanders] was going to pull a gun out on [him]." *Id*. Petitioner said he pulled his gun out and started shooting while moving backwards. *Id*. He denied standing over Sanders while shooting. *Id*.

Petitioner said someone shot at him so he fled the scene and was struck by a white truck on the left side of his body. *Id*. ¶ 20. Petitioner got in the Monte Carlo and took off, with the white truck in pursuant, until the police stopped him. *Id*. Petitioner further explained that when he was being interviewed at the police station, he felt sleepy and had trouble concentrating due to the pain medication he received at the hospital. *Id*. ¶ 21.

Prior to resting, the defense asked the trial court to reconsider its order on the state's motion in limine regarding the evidence that Sanders had a gun when he was killed. *Id.* ¶ 22. Specifically, the defense wanted to recall a police officer to testify that while he searched Sanders' body for identification, he found a concealed handgun in Sanders' pants. *Id*. The trial court denied the request, explaining that the evidence that Sanders had a gun in his pants was irrelevant because there was no evidence that Petitioner saw a gun or that Sanders reached for a gun in his pants. *Id*. ¶ 24. Rather, Petitioner only testified that Sanders made a "pulling out" motion with his hand in his jacket pocket. *Id*.

In rebuttal, the State called the detectives who interviewed Petitioner after his arrest, who testified that Petitioner never said that Sanders displayed a gun on September 13 and never claimed that Sanders made a motion as if he were going

to pull his hand out of his jacket before Petitioner shot him on September 21, 2013. *Id.* ¶ 26.

The trial court denied the defense's request to instruct the jury on self-defense, but allowed a second-degree murder instruction because the evidence could support a theory that Petitioner had an unreasonable belief that lethal force was necessary. *Id*. ¶ 27. The jury found Petitioner guilty of first degree murder, and the trial court sentenced him to 60 years in prison.

C

Petitioner appealed, arguing that (1) the trial court abused its discretion by granting the State's motion in limine preventing the defense from introducing the evidence that Sanders had a concealed handgun on him; and (2) the trial court committed reversible error when it refused to instruct the jury on self-defense. *Williams*, 2016 IL App (3d) 140380-U, ¶ 30. The Illinois Appellate Court agreed that the evidence of a concealed handgun found on Sanders' body was irrelevant, so concluded that the trial court did not abuse its discretion by disallowing the evidence. *Id*. ¶¶33–40. The Illinois Appellate Court also found that the trial court did not err in disallowing the self-defense instruction because no evidence had been presented at trial that would have made Petitioner's belief that deadly force was necessary a reasonable belief. *Id*. ¶ 50.

Petitioner filed a Petition for Leave to Appeal (PLA) raising both claims with the Illinois Supreme Court, which was denied on March 29, 2017. *People v. Williams*, 80 N.E.3d 6 (Ill. 2017).

D

Petitioner next filed a state postconviction motion in the trial court in January 2018. He alleged: (1) that trial counsel was ineffective for failing to impeach Antonio Hardy with a prior inconsistent statement; (2) that the trial court had denied his constitutional right to counsel of choice when it denied his last-

8

minute request for a continuance to retain private counsel; (3) he was denied due process because the trial court excluded evidence that the victim was armed; and (4) appellate counsel was ineffective for failing to raise the first and second claims. The trial court dismissed the petition as frivolous and patently without merit, and Petitioner appealed.

On appeal, Petitioner argued that he pleaded the gist of a claim that his right to counsel of choice was violated and that his trial counsel provided ineffective assistance when he failed to impeach Antonio Hardy with a prior inconsistent statement. *People v. Williams*, 2023 IL App (3d) 190317-U. The Illinois Appellate Court rejected both claims. *Id*. ¶¶ 18–30. It found that the trial court did not abuse its discretion by denying Petitioner's request for a continuance to obtain new counsel "minutes before jury selection was set to begin." *Id*. ¶ 24. The Illinois Appellate Court also rejected Petitioner's claim that his trial counsel was ineffective for failing to impeach Hardy with a prior inconsistent statement, reasoning that because "[m]ost of Hardy's testimony was corroborated by [Petitioner's] own testimony," counsel was not ineffective for failing to impeach Hardy on an insignificant detail and there was no prejudice. *Id*. ¶ 30.

Petitioner raised the two claims from his appeal in a PLA to the Illinois Supreme Court, which was denied on September 27, 2023. *People v. Williams*, 221 N.E.3d 383 (Ill. 2023).

Petitioner also filed a successive postconviction proceeding in state court in May 2020. He raised 27 claims, including claims that his trial counsel was ineffective during voir dire and the trial court conducted an inadequate voir dire, and that he was denied a fair trial due to cumulative errors. The trial court denied leave to file a successive petition. While Petitioner appealed, he subsequently voluntarily dismissed his appeal.

**E**

Petitioner filed this Petition for Writ of Habeas Corpus pursuant to 28 U.S.C.

§ 2254 on February 22, 2024. He raises seven grounds for relief:

(1) Petitioner's due process rights were violated due to the cumulative effect of the trial errors (doc. 1 at 5);

(2) Trial counsel rendered ineffective assistance of counsel during voir doir for failing to ensure all jurors were asked whether they have been victims of violent crimes and other important questions (*id.* at 6–7);

(3) The trial court conducted an inadequate voir dire and refused to dismiss jurors with cause (*id.* at 8);

(4) Trial counsel's assistance was ineffective when he failed to impeach Antonio Hardy, a state witness, with his inconsistent statements about whether another person jumped out of the car Petitioner was driving (*id.* at 12);

(5) Petitioner was denied counsel of choice (*id.* at 15);

(6) The Illinois Appellate Court unreasonably found that the trial court's refusal to instruct the jury on self-defense was harmless (*id.* at 17);

(7) The Illinois Appellate Court unreasonably determined that trial court did not abuse its discretion in excluding evidence that Sanders had a gun on him the night he died, (*id.* at 19).

Respondent filed its response to the Petition and argues that Petitioner's claims are either procedurally defaulted, meritless, or non-cognizable. (Doc. 11). Petitioner filed a timely reply. (Doc. 13). The matter is now ripe for review.

**II**

Federal courts can grant writs of habeas corpus "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). However, prior to considering the merits of a petitioner's claims, federal courts "must consider which claims have been procedurally defaulted." *Id.* There are two types of procedural default: First,

procedural default occurs "where the state court declines to address a petitioner's federal claims because the petitioner did not meet state procedural requirements[.]" *Id.* (quoting *Thomas v. Williams*, 822 F.3d 378, 384 (7th Cir. 2016)). Second, "[a] state prisoner can procedurally default a federal claim if he fails to 'fairly present' it 'throughout at least one complete round of state-court review, whether on direct appeal of his conviction or in post-conviction proceedings,'" *Clemons*, 845 F.3d at 819 (quoting *Richardson v. Lemke*, 745 F.3d 258, 268 (7th Cir. 2014)), and "it is clear that those courts would now hold the claim procedurally barred," *Perruquet v. Briley,* 390 F.3d 505, 514 (7th Cir. 2004). Accordingly, "[s]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process," which in Illinois requires the petitioner to "include his claims in a petition for leave to appeal to the Illinois Supreme Court." *Snow*, 880 F.3d at 864 (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 845–46 (1999)).

Moreover, where a state court has adjudicated a petitioner's claims on the merits, pursuant to § 2254(d), "[a] federal court may grant a federal petition for habeas corpus only if the state court's ruling on the federal constitutional question 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court,' or 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Snow v. Pfister*, 880 F.3d 857, 863–64 (7th Cir. 2018) (quoting 28 U.S.C. § 2254(d)). A state court's decision is "contrary to" clearly established federal law "if the state court 'applie[d] a rule different from the governing law set forth' in Supreme Court decisions or decided a case differently than the Supreme Court 'on a set of materially indistinguishable facts.'" *Corral v. Foster*, 4 F.4th 576, 582 (7th Cir. 2021) (quoting *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court decision is an "unreasonable application of" clearly established

11

federal law if the state court "identifies the correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case." *Coleman v. Hardy,* 690 F.3d 811, 814 (7th Cir. 2012) (quoting *Williams v. Taylor*, 529 U.S. 362, 407 (2000). This Court's review is limited to the record that was before the state court.

**III**

**A**

Petitioner's first three grounds for relief (his claim of cumulative errors resulting in a due process violation and his two claims regarding errors during voir dire) are procedurally defaulted because he failed to present them through one full round of state court review. As Petitioner notes, he did present these grounds for relief in his successive postconviction petition. However, to avoid procedural default, Petitioner needed to present these grounds in a postconviction appeal and postconviction PLA. He did not do so, so his claims are procedurally defaulted.

"Procedural default may be excused . . . where the petitioner demonstrates either (1) 'cause for the default and actual prejudice' or (2) 'that failure to consider the claims will result in a fundamental miscarriage of justice.'" *Snow*, 880 F.3d at 864 (quoting *Thomas*, 822 F.3d at 386). "[T]he miscarriage of justice exception applies only in the rare case where the petitioner can prove that he is actually innocent of the crime of which he has been convicted." *Wilson v. Cromwell*, 69 F.4th 410, 421 (7th Cir. 2023) (internal citations omitted). Here, Petitioner's reply only argues that his claims are not defaulted because he presented them to the trial court in his postconviction proceedings. Petitioner has not presented any basis to excuse his default and the Court finds no reason apparent from the record. Accordingly, the Court finds that Petitioner's first three grounds of relief must be dismissed for procedural default.

12

**B**

Petitioner's fourth ground for relief was presented to the state court through one full round of state court review, but the Court finds that the state court's decision on this grounds is entitled to deference under 28 U.S.C. § 2254(d)(1). Petitioner argues that trial counsel's assistance was ineffective when he failed to impeach Antonio Hardy, a state witness, with his inconsistent statements about whether another person jumped out of the car Petitioner was driving. Ineffective assistance of counsel claims arise under the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland's* two-part test, a petitioner must show both that his attorney's performance was deficient and that he was prejudiced as a result. *Vinyard v. United States*, 804 F.3d 1218, 1225 (7th Cir. 2015). Courts, however, must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 690. A petitioner must also prove that he has been prejudiced by his counsel's representation by showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Absent a sufficient showing of both cause and prejudice, a petitioner's claim must fail. *United States v. Delgado,* 936 F.2d 303, 311 (7th Cir. 1991).

The Illinois Appellate Court, while citing to Illinois law, correctly stated the two parts of the *Strickland* test. *Williams*, 2023 IL App (3d) 190317-U, ¶ 27. Moreover, the Illinois Appellate Court's conclusions on Petitioner's claims were not unreasonable applications of *Strickland*. The Illinois Appellate Court noted that a decision to impeach a witness is usually a matter of sound trial strategy. *Id.* ¶ 28. *See also, Bryant v. Brown*, 873 F.3d 988, 996 (7th Cir. 2017) ("A 'decision not to impeach a particular witness is normally considered a strategic choice within the discretion of counsel.'" (quoting *Jones v. Butler*, 778 F.3d 575, 584 (7th Cir. 2015)). The Illinois Appellate Court then found that the impeachment evidence was not

13

significant. *Id.* ¶ 29–30. The impeachment evidence was only that Hardy gave inconsistent statements about whether, during the car chase after the shooting, another individual exited the Monte Carlo that Petitioner was driving and entered a red car. *Id.* The majority of Hardy's testimony was corroborated by Petitioner's own testimony—Petitioner also testified that he was struck by a white truck, drive away in a Monte Carlo, and was followed by the truck until the police intervened. *Id.* Accordingly, the Illinois Appellate Court found that whether someone exited the vehicle is insignificant and trial counsel's decision not to use insignificant evidence to impeach Hardy did not make counsel's conduct fall below an objective standard of reasonableness. *Id.*

Petitioner does not specifically address how the Illinois Appellate Court's denial of his claim was an unreasonable application of Strickland, but argues that "there was no conceivable strategic or tactical advantage gained by counsel's omissions." Doc. 13 at 25. He further states that the evidence that there was a person jumping from Petitioner's car and into a red car, insinuated "that this was a premeditated murder." *Id.* at 26. Petitioner highlights that Hardy had also stated that Petitioner stood over Sanders' body while shooting. *Id.* The Court assumes that Petitioner's argument is that impeaching Hardy's memory of the car chase might have also made the jury question whether the detail regarding Petitioner standing over Sanders' body was correct. However, while the argument is not frivolous, the Court cannot find that the Illinois Appellate Court's decision was an unreasonable application of *Strickland*. Other than these two details, Petitioners account of the shooting was generally in line with Hardy's. Whether someone jumped out of Petitioner's car was legally insignificant to self-defense or to the second degree murder standard. The Illinois Appellate Court's finding that counsel was not ineffective for focusing his cross-examination on this insignificant

14

impeachment evidence did not rise to the level of ineffective assistance of counsel is, at a minimum, entitled to deference.

## C

Next, in ground five, Petitioner argues that the trial court impermissibly denied him counsel of his choice. The Court again finds that the Illinois state court's decision on this issue is entitled to deference, and even if not, would be meritless under Seventh Circuit precedent as well. If a defendant has the means to hire his own attorney, the Sixth Amendment has a qualified "right to select and be represented by one's preferred attorney." *Wheat v. United States*, 486 U.S. 153, 159 (1988); *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144, (2006). Trial courts must recognize a presumption in favor of a defendant's counsel of choice. *Id.* at 160. An erroneous denial of choice of counsel is an structural error that does not require a showing of prejudice. *Gonzalez-Lopez*, 548 U.S. at 150.

Accordingly, the Sixth Amendment bars a court from denying a defendant the right to retain counsel of his choice arbitrarily or unreasonably," *Carlson v. Jess*, 526 F.3d 1018, 1024–25 (7th Cir. 2008) (citing *Ford v. Israel,* 701 F.2d 689, 692 (7th Cir.1983)). *See also United States v. Sellers*, 645 F.3d 830, 835 (7th Cir. 2011) (finding it arbitrary to adhere to a rigid rule that "a lawyer must take the case as he finds it" and a "myopic insistence on proceeding with a scheduled trial date in the face of a valid request for a continuance is arbitrary and unreasonable"); *Carlson v. Jess*, 526 F.3d 1018, 1027 (7th Cir. 2008) (finding right to choice of counsel was unreasonably violated where judge insisted on expeditiousness for its own stake where the witnesses and jurors had not yet assembled, made no effort to "ascertain the facts and follow up on [defendant's] reasonable justifications for seeking a substitution," and did not balance the concerns of expeditiousness against the defendant's interest in having his attorney of choice). Nonetheless, "the trial court has broad discretion in addressing a continuance motion based on the right. The

15

court is entitled to weigh the defendant's claim against the need to ensure the fair and efficient administration of justice." *United States v. Sinclair*, 770 F.3d 1148, 1150 (7th Cir. 2014).

This ground again was raised in Petitioner's state post-conviction motion and last addressed on the merits in the Illinois Appellate Court. *Williams*, 2023 IL App (3d) 190317-U, ¶ 19. The Illinois Appellate Court cited Illinois cases, but generally stated the correct standard:

> Criminal defendants are guaranteed the right to retain counsel of their choice by both the United States and Illinois Constitutions. U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8. This right, while fundamental, may be forfeited where it is used to "delay trial and thwart the effective administration of justice." *People v. Tucker*, 382 Ill. App. 3d 916, 920 (2008). A court's determination on whether to allow a continuance for substitution of counsel will not be overturned absent an abuse of discretion. *People v. Segoviano*, 189 Ill. 2d 228, 245 (2000).

*Id.* ¶ 20. The Illinois Appellate Court further stated that a court "will not be found to have abused its discretion *** in the absence of ready and willing substitute counsel." *Id.* ¶ 22. Relying on this caselaw, the Illinois Appellate Court found that because no substitute counsel was ready and willing to stand in, that there was no abuse of discretion. *Id.* ¶ 25. While the analysis is not as comprehensive as the Seventh Circuit's analysis in similar cases, the Court does not find that the Illinois Appellate Court's statement of the law was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court. *See* 28 U.S.C. § 2254(d)(1). (Indeed, it seems strange to say that a right to counsel of choice could be violated where Petitioner had not even identified the counsel of his choice.)

Moreover, under Seventh Circuit precedent, Petitioner's claim is meritless as well. The Seventh Circuit instructs courts to "weigh the defendant's claim

16

against the need to ensure the fair and efficient administration of justice." *Sinclair*, 770 F.3d at 1150. The fact that an substitute attorney has not been hired or has not appeared weighs strongly against granting a continuance, as does an unexplained delay in seeking substitute counsel. *See Sinclair*, 770 F.3d at 1154-56 (7th Cir. 2014) (district judge who denied a continuance "appropriately weighed the uncertainties of [defendant's] plan to hire private counsel against the costs of a last-minute adjournment to the government, the witnesses, and the fair and efficient administration of justice," which "take on greater significance" on the eve of trial); *Balsiger*, 910 F.3d 942, 950 (7th Cir. 2018) (fact that defendant's "preferred attorney. . . never appeared to request a continuance" was "'a significant factor weighing against granting a continuance'"). Here, Petitioner requested a continuance to obtain new counsel just 30 mins before the scheduled start of trial and had not yet hired—or even obtained the funds to hire—private counsel. In this context, when Petitioner asked for a continuance, the trial court "found the request to be disingenuous where it came after the parties had announced they were ready for trial, and minutes before jury selection was set to begin due to an ambiguous telephone conversation." *Id*. ¶ 24. Petitioner was given the opportunity to explain when the circuit judge noted that it had been months since Petitioner had been arrested and specifically asked Petitioner, "you spoke to your family about hiring a lawyer this weekend?" (Doc. 12-3 at 24). Petitioner responded, "Yes. They did not have the money accumulated for a lawyer, Your Honor. They just now have pulled some loans out and were able to do it over the weekend." *Id*. In an abundance of caution, the court asked defense counsel to get more information from Petitioner's family and find out if another attorney was ready to appear. *Id*. When defense counsel reported back it was clear that there was no new counsel prepared to take over Petitioner's defense, and the funding had not even been secured. Id. ¶ 25. Accordingly, in making his decision, the trial judge considered

17

that there was no substitute counsel identified, the only reason for the timing of the last minute request was funding suddenly (and only potentially) becoming available, and the witnesses and potential jurors had already gathered with the trial set to start just minutes later. His decision denying the continuance could not be considered unreasonable or arbitrary.

At the time, Petitioner did not assert that he had any disagreement or dissatisfaction with appointed counsel, which might suggest that a substitution of counsel was necessary to protect Petitioner's rights. Petitioner claims that this is because the trial court did not ask him. (Doc. 13 at 30). He now asserts that he lost confidence in his attorney when, "on a prior visit with defense counsel, Petitioner asked defense counsel some basic questions about the trial process itself. Counsel replied he did not know because this would be his first trial." (*Id*. at 27–28). At this time, "Petitioner determined that he wanted private counsel, but [his] family did not have the available funds to obtain private counsel yet, and so Petitioner never mentioned wanting private counsel. Over the weekend Petitioner's mother informed him that she will pull out a loan and hire a private attorney." (*Id*.). However, Petitioner's argument does not appear to have been presented at any previous stage in the litigation and he was, in fact, specifically given the opportunity to explain himself before the circuit court reached its decision and only stated that his family did not previously have the money accumulated for a lawyer. (Doc. 12-3 at 24). Petitioner responded, "Yes. They did not have the money accumulated for a lawyer, Your Honor. They just now have pulled some loans out and were able to do it over the weekend." *Id*. Petitioner did not state that he had just now lost confidence in his attorney due to a recent conversation, only that he just now believed he might be able to have the funds to hire private counsel. Accordingly, the Court finds that the Illinois Appellate Court's decision is entitled to deference under § 2254(d)(1) and, even if not, the Court also finds it is meritless.

18

### D

Petitioner's final two grounds for relief, six and seven, are interrelated as he challenges the failure to instruct the jury on self-defense and the related exclusion of the evidence of Sanders' concealed weapon and tattoos. However, the Court finds that Petitioner is only alleging only state law errors, which are not cognizable in federal review. To the extent Petitioner sought to raise a due process claim, it is meritless.

Respondent argues that these claims are not cognizable in federal review because they concern only state law. *See* 28 U.S.C. § 2254(a); *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."); *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."). "Because a state trial court's evidentiary rulings and jury instructions turn on state law, these are matters that are usually beyond the scope of federal habeas review." *Perruquet v. Briley*, 390 F.3d 505, 511 (7th Cir. 2004). Nonetheless, a state defendant does have a Fourteenth Amendment right to a fundamentally fair trial, and erroneous evidentiary rules and jury instructions can violate this right in extreme situations. *Id.* at 511 (citing *California v. Trombetta,* 467 U.S. 479, 485, (1984).

Here, Petitioner appears to be alleging state court errors and frames his grounds for relief as such: In ground six, he argues that the Illinois Appellate Court erred when it found that the trial court's refusal to instruct the jury on self-defense was harmless. (Doc. 1 at 17; Doc. 13 at 34). And, in ground seven, he argues that the Illinois Appellate Court erred when it found that the trial court did not abuse

its discretion in excluding evidence to the jury. (Doc. 1 at 19; Doc. 13 at 39). Accordingly, neither of these grounds for relief implicate federal law. Petitioner does not mention the Fourteenth Amendment nor any notions of due process for support in either his Petition or his reply. And, while he does cite to federal cases in his reply, the citations concern evidentiary law in federal criminal cases under the Federal Rules of Criminal Procedure and the Federal Rules of Evidence. (*See, e.g.*, Doc. 13 at 42). Accordingly, even under an extremely liberal reading of the briefing, the Court does not find that Petitioner has implicitly raised a due process claim. His state law claims, therefore, must be dismissed as not cognizable in federal review.

Petitioner did at least mention the due process clause in his direct appeal brief, (Doc. 12-6 at 17), and in his PLA, (Doc. 12-12 at 24). These minor mentions, which the Illinois Appellate Court did not consider sufficient to necessitate a due process analysis, were likely insufficient to qualify as raise the ground for relief at the state level as well.

Nonetheless, even if Williams brought a due process claim, it would be meritless on these facts. Errors in jury instructions that relieve the state of proving beyond a reasonable every element of the charged offense violate a defendant's due process rights, as "such directions subvert the presumption of innocence accorded to accused persons and also invade the truth-finding task assigned solely to juries in criminal cases." *Carella v. California*, 491 U.S. 263, 265 (1989); *see also Sullivan v. Louisiana*, 508 U.S. 275, 278 (1993). However, under Illinois law, "[s]elf-defense is an affirmative defense, and once a defendant raises it, the State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense, in addition to proving the elements of the charged offense." *People v. Lee*, 821 N.E.2d 307, 311 (2004). As the Northern District of Illinois has noted, "[a]lthough Illinois has chosen to put the burden on the prosecution to disprove

20

self[-]defense beyond a reasonable doubt, this is not required by the federal constitution." *Ellis v. Butler*, No. 15 C 2240, 2015 WL 8988712, at *3 (N.D. Ill. Dec. 16, 2015). Self-defense is not an element of an offense because it does not negate any element of a charged offense; rather it justifies or excuses the defendant's conduct as a legal matter. *Brown v. Eplett*, 48 F.4th 543, 553–54 (7th Cir. 2022). And where affirmative defenses "'excuse[s] conduct that would otherwise be punishable,' but 'does not controvert any of the elements of the offense itself,' the Government has no constitutional duty to overcome the defense beyond a reasonable doubt." *Smith v. United States*, 568 U.S. 106, 110 (2013) (quoting *Dixon v. United States,* 548 U.S. 1, 6 (2006)); *see also Engle v. Isaac*, 456 U.S. 107, 120 (1982) ("A State may want to assume the burden of disproving an affirmative defense without also designating absence of the defense an element of the crime"). Accordingly, any jury instruction error regarding self-defense only implicates state law, and not federal constitutional law.[3]

An argument that the state court's evidentiary ruling violated due process fares no better. "State court evidentiary rulings only implicate the Due Process Clause when 'evidence 'is so extremely unfair that its admission violates fundamental conceptions of justice[.]'" *Richardson v. Lemke*, 745 F.3d 258, 275 (7th Cir. 2014) (quoting *Perry v. New Hampshire*, 565 U.S. 228, 237 (2012)). "When engaging in an evidentiary due process analysis, we often simplify the inquiry by asking whether the probative value of the evidence is greatly outweighed by the

---

[3] In his reply, Petitioner cites *Mathews v. United States,* 485 U.S. 58 (1988), for the proposition that "a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor," 485 U.S. at 63. (Doc. 13 at 36). However, *Matthews* is a federal case confronting the standards for federal criminal law, not constitutional law and is inapposite when confronting the state affirmative defense issue here. Accordingly, the Court finds ground six must be dismissed as not cognizable in federal review.

prejudice to the accused[,]" and the evidence "influenced the jury so heavily and so improperly as to violate fundamental conceptions of justice." *Id*. at 276.

Here, the fact that police found a concealed weapon in Sanders' pants was not relevant to Petitioner's defense because there was no evidence that Sanders threatened Petitioner on the night of the shooting, that Petitioner saw Sanders' gun, or even that Sanders' reached towards his pants. Instead, Petitioner testified that he pulled out his weapon during his altercation with Sanders eight days earlier, and when Sanders saw the gun, he moved his jacket out of the way and said "oh, we got those too." *Williams*, 2016 IL App (3d) 140380-U, ¶ 18. Petitioner thought he saw the butt of a gun because something black was sticking up on Sanders' hip. *Id*. When Petitioner returned to the scene days later, he claimed that the Sanders "said 'what's up,' and appeared to pull his hand out of his jacket pocket." *Id*. ¶ 36. Petitioner never saw Sanders with a gun, and police did not find a gun in Sanders' jacket. Instead, as the trial court explained, "police only found [Sanders' gun] after they were doing what amounts to a dead man's pat down and undoes his pants before he can even find it." *Id*. ¶ 37. The Illinois Appellate Court concluded that "the evidence [of Sanders' concealed handgun] was irrelevant" to Petitioner's claim of self-defense. *Id*. ¶ 40. The Court agrees with the Illinois Appellate Court that this evidence had no probative value. Therefore, Petitioner cannot meet the higher standard of showing its exclusion was so extremely unfair" that it violated "fundamental conceptions of justice." *Perry*, 565 U.S. at 237.

## IV

Should Petitioner wish to appeal this decision, he must obtain a certificate of appealability. 28 U.S.C. § 2253(c)(1). A certificate may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This will hold true only when "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack*

*v. McDaniel*, 529 U.S. 473, 484 (1995). Where a claim is resolved on procedural grounds, a certificate of appealability should issue only if reasonable jurists could disagree about the merits of the underlying constitutional claim *and* about whether the procedural ruling was correct. *Flores-Ramirez v. Foster*, 811 F.3d 861, 865 (7th Cir. 2016). Here, the Court does not find that reasonable jurists could disagree that the Petitioner's claims are either procedurally defaulted, entitled to deference under 28 U.S.C. § 2254(d), not cognizable in federal review, or meritless. Accordingly, the Court declines to issue a certificate of appealability.

V

The Clerk of Court is directed to enter judgment as follows: Petitioner Cortez Williams' Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (Doc. 1) is DENIED. The Court DECLINES to issue a certificate of appealability. The Clerk is DIRECTED to substitute Warden John Barwick as Respondent. This case is CLOSED.

*It is so ordered.*

Entered on April 25, 2025.

s/Jonathan E. Hawley
U.S. DISTRICT JUDGE